Good morning. I'm Paul Eaglin, representing Angela Struck. I'm from Fairbanks. Thank you for hearing her case. Prior to the court today, my colleague, Carol Holt, mentioned to me that there are a few pages missing from the record, and she'd like to supplement. I do not object, and I think it might, with the court's permission, if she could present that now, it might help. Oh, all right. Good. Thank you. Thank you. And so the judge determined that it was necessary to, one, try to obtain some medical records of a hospitalization that took place in the early part of 03, and then secondly, because it was realized also in the first hearing that her vocational rehabilitation counselor was working with a psychologist in connection with her voc rehab file, that it might be helpful to get the record of that psychologist. Those were obtained after the first hearing, before the second hearing. There was a different judge the second time around. At the end of this entire process, however, Judge Cranus made credibility determinations based on the second hearing with respect to her, whom we did hear, admittedly, in the first hearing. But he also made a credibility – adverse credibility determination about a witness whom she brought, Mr. Bowles, whom Judge Cranus never heard. Do we know if he had access to the tapes? Presumably he did, didn't he? I would presume the same thing, although we do not know that from the record, Your Honor. We don't know that because the government argues that he listened to the tapes. Well, we don't know that. He didn't say that. In fact, he wrote the decision in such a way that if you had only that, you would not realize that he was not at the second hearing. Were any of his credibility determinations made upon demeanor of witnesses at the second hearing? I don't know how he made the credibility determination, Your Honor. Was there any indication in the record that he made any determinations on credibility based upon demeanor?  So it wasn't looking at a witness that was a problem. The record – there's no indication he made credibility determinations based on looking at a record. So if that's so, then your argument would be that just because he wasn't there, there's a due process violation? There's a due process violation in that he was not there. The record does not reflect his absence. The Social Security Administration's own internal documents that govern the hearing process specify, as I argued in the brief, certain circumstances for substitution of one ALJ for another. Yeah. These did not apply here. None of those circumstances applied here because he was not unavailable. Obviously, death does not apply. He was not unavailable. There's no indication that he was ill or on vacation. So the circumstances that are defined by the government's own hearing process for fair hearings at Social Security disability hearings indicate when may there be substitution. I don't get your argument there. If the Social Security determinations only apply when the ALJ is not available to decide the case, then the very nature of that is that that regulation doesn't apply. But you take it a step further and say that's automatically a violation of the regulation. But if there's no regulation for it, then there's no violation. Well, I think that it – what I'm trying to argue, by citing the regulation in the way that I did, is that indicated a process that the government thought was fair in establishing the hearing process. When the ALJ is not available to make a decision. Right. But that doesn't necessarily indicate, does it, that it's a violation due to process when the ALJ is available to make the decision. If he is? Of course, it would have been better if he'd been there. But the question is, is it a violation of fundamental fairness when he's not, providing he doesn't make any decision based upon demeanor of witnesses? I don't think that it – well, I understand your point, Your Honor, but I would say that it should not be limited only to circumstances in which he's making adverse credibility determinations based on demeanor of witnesses. We have here also a circumstance in which for it – she should have been given notice that was – that there was going to be a substitution of one ALJ for another and that a consequence of that type of substitution is that the judge who heard her principal case and who was going to decide the case, going to be the writing judge, in other words, might make these types of determinations in the absence of actually seeing a witness and observing a witness. That might have informed – better informed her decision whether to agree to a process like that. She got no such notice. And that gets to the point of the supplement that you were just handed this morning. I'm not contending that she did not know the time and the day of the hearing. That's not the kind of notice I'm talking about. I'm talking about a notice in the constitutional due process sense of being apprised of, being made to realize as best as possible the constitutional consequences of the case. And what's your case that says that's a violation of fundamental due process? The cases that I argued in the – in the brief, which has to do with the fundamental Richardson v. Perales due process case governing – generally governing hearings such as this.  Sorry? I finished Judge Wallace's question. Then I have a question for you. Go ahead. Okay. Yes. My question is, so the ALJ wanted additional medical records, correct? He did because – And he was going to – and he was – he had her sign – A release. Release – several releases. He was going to try and get the records. From the hospital. Let me ask you this. Did he get all the records that he was seeking – that he thought was relevant to a fair decision? I think he got none of them. Okay. None came from the hospital. Now, the medical expert that was there at the hearing – Dr. Bottrell. He thought it was important to have those records, correct? She did. Dr. Bottrell, when she learned – she learned about it at the first hearing. That's when she first learned that Ms. Strzok had been hospitalized. And she said, you know, I think I'd really like to see these records. Now, is there anything in the record that reflects why those records were never obtained? No. No, Your Honor. Is there anything in the record that reflects there was any follow-up, you know, to get those records? No, Your Honor. Our position is that the record does not reflect that it was – that the release was even sent out. The government argues differently, but our position is that I can find nothing in the record to indicate – How would those records have helped or aided the – either the medical expert that was there at the hearing or the ALJ in evaluating her claim? Because it – as I understand it, it was a hospitalization against her will in early 2003 by order of a Superior Court Judge Mary Green here. Because it was involuntary, it could have revealed information such as about whether she had – was under the influence at the time. The government makes a lot of that here. Of course, being under the influence has a lot – hand-in-hand almost with being bipolar, that those two go together a lot. It would have revealed drug use, possibly. It would have revealed the extent to which she might have been decompressing, which could have been a useful factor to know in terms of adjudicating whether she met or equaled a listing-level impairment. It could have better informed the subsequent process at Steps 4 and 5 in terms of the residual functional capacity analysis. I think it could have been very helpful, Your Honor. But how would it – how would – I'm sorry. Is there a showing in the record that any of this evidence would have affected the ALJ's RFC assessment that Strzok could perform simple repetitive light work which involved limited public contact? Your Honor, I don't think that there is in the record because we don't have those hospital records that Judge Paez was just asking about. We don't have those. And we don't know how those records, had they been obtained, could have informed the residual functional capacity analysis or any of the other levels of the analysis at which they could have been pertinent and relevant. So the answer to the question is there's no way of knowing whether it would have helped her or not. Correct, Your Honor. I would agree with that. Unless they're produced in some fashion. That's correct. I'm trying to get – Which is why I think they're important. So there's no prejudice shown? The end result, there's no prejudice shown by this record? I would not agree with that, Your Honor. Let me ask you the question again. Where is the record that shows that the ALJ's RFC assessment that she could perform simple repetitive light work involved limited public contact? Where is it shown that there is something in the record that would have helped that? I thought we were over that point. The way I understood the question, Your Honor, is that you were – I thought you were asking me how would these hospital records have helped, have they been obtained. And I'm saying I don't know because they weren't obtained. I don't know what would have been revealed by the records. Yes. So we don't know whether there's prejudice or not? We don't – we can't be sure of that unless we were to look at the records. But I'm saying that because – Precisely. That was the point. Okay. Thank you. How would those records be obtained? She signed the release. Then what would the next step be if somebody was going to obtain them? My understanding is that typically the Social Security – once a judge returns to Seattle, he would give it to somebody on the staff there, whoever it is who sends out these types of requests. And they would be requested by the Social Security? Yes, sir. I see. That seems to me quite important. Who had the responsibility for retrieving them? He was taking the – the way I read it is he was taking the responsibility for doing that by having her sign the release, which he took back to Seattle with him. And we know that, that she signed it and that he took it back. She signed it and he did take it back. Yes, sir. That's right. Thank you. We know that the medical expert at the hearing, or whoever she was, thought that those records were important to her assessment. Dr. Patrell indicated that. At least that's what I read from the transcript. I read it the same way, Your Honor. I see my time is up. Okay. Yes. Thank you. Thank you. I'll give you a minute for rebuttal. Thank you, Your Honor. May it please the Court. Good morning. I'm Carol Hoke here on behalf of the Commissioner. And there are many things I'd like to address. First of all, the question of who requests the records, I would direct the panel's attention to the supplement at page 33. This is the actual letter that went to the Memorial Hospital. And the way it works is that the ALJ takes the authorization back to the hearing office, gives it to a clerk who sends it to the state agency, and the state agency then generates this letter that goes to the facility. Whatever does or doesn't come back again to the state agency, then into the hearing office. You've lost me along the line. He gets the release. Then what happens? I'm sorry. The judge takes the release back to the hearing office. The clerk for the judge sends it to the state agency, the DDS we refer to it as. The DDS is the actual component. It's a state agency in Anchorage, actually. And does he get anything back? Pardon me? Does he get anything back? He would, yes, if there was a response. What does he get back? He would get the records he asked for. He did get them. In this case, he got records from the mental health center. They appear at SCR 35 and continue. Were those the records he asked for? Yes, he asked for two sets of records. He asked for hospital, which is what did not come back. He never got the hospital records. There are not hospital records that he asked for. He asked for them. He didn't get them. Well, wasn't his responsibility to follow up on it? If he didn't get them, shouldn't he have said, please give them to me? The procedure is that the judge asks once. Well, you know, he has a responsibility to develop the record. If the procedure is inadequate, it's his problem. Excuse me, under Tidwell, he fulfilled his responsibility to develop the record. Why? Tidwell says that the act of requesting fulfills the ALJ's duty to develop. Now, granted, if I had been the ALJ, perhaps I would have taken another step. Granted, if I were the ALJ. We might have all taken another step. I don't know Tidwell, so I'll have to look at it. But it seems to me quite inadequate. If he asks for records and there's no response, he's just going to sit there like a bump on a log? I don't think any ALJ is sitting like a bump on a log. Well, what's he doing? I'm sorry, but their caseload is incredible. If you've read anything, the pending cases are just astronomical. Anyway, a couple other things that I wanted to address. The medical expert, what did she say about those records? Did she need them? Did she not need them? If you look at Excerpt of Record 102, this is where the ME is starting to testify. And the ALJ, this is after we've talked. I'm sorry, the appellant has said, oh, yes, I was in the hospital. And the ALJ says, well, how many times were you in the hospital? And she says, well, twice. Twice, I think. So she's a little bit unclear. Was it once? Was it twice? Was it just February of 2003 when she was court committed? Was there another one? The record is not very clear on that. Eventually, the ALJ gets to the medical expert and says, well --" Wait a minute. Wait a minute. I'm missing something here. Is there a statement in the record that the medical expert, the doctor, thought it was important for her to review the medical record? That's the next thing I was going to say. If you look at Excerpt of Record 102, the ALJ's question, well, what do you think? Can you identify what this young woman's impairments are, how severe they may be? Answer, it would certainly be of assistance if we had the records of the inpatient treatment inaudible. That might add some additional information. Then the ME goes on for several pages and actually gives her opinion. She didn't categorically say, I cannot testify without those records. She said, yeah, you know, it would help. It would give me some information. But then she goes on at Excerpt Record 103, 104. She goes on for pages about what she thinks. Well, right after that little call, that statement that you read, the ALJ goes right into asking, makes it pretty clear that he's going to get the records, or he's going to try to get the records. Exactly. That's what happens. I agree. And then they go on with what then is available. She does. Let me ask you this. You're telling me that he did get back one set of the records that he saw from the mental health facility. Yeah, there were two sets, hospital and mental health. Now, do we know from this record that the expert, this whoever she is, did she get a chance to review those records and then sort of come back and testify as to what those records did or didn't do or help? No. No. When? Why did that? I mean, there was another hearing, so why wasn't she then called to supplement the record? The other hearing was a function of the ALJ proffering what records he did get to the appellant and saying, here are your options. You want to give me a written reply? Do you want a supplemental hearing? If you do, I'll hold one. She wrote in and said, I'd like a supplemental hearing. Right. So why didn't he have the medical expert there as well at that supplemental hearing? I believe it was because of the content of what he had in the mental speculation, but if you look at the mental health center records he got, it's basically medication checkups monthly for about six or eight months, doing well, adjusted wellbutrin or whatever. There's very little substance to them, and then they peter out. Where are those particular records in the record? What's the record site, please? That's in the SER, I believe. SER. Starting at 35 and continuing for quite a few pages. It's, let's see, 35 through 58. It's the last part of the SER. And if you just start at 36 is the actual first record note. Patient's case was closed because she actually had canceled. The next page, in April of 2003, canceled her scheduled appointment. March of 2003, did not keep. November of 2002, did not keep. So you're getting a flavor that we have records, but is a medical expert really necessary? The ALJ would make that determination. So there was a vocational expert called. If you notice the hearing that Judge Adams sent out, which I offered as a supplement to the supplemental excerpt of record, this was signed by Judge Adams. So the appellant knew. It said, I'm going to hold a hearing. I have set aside time. That's when Judge Adams is introducing himself. On page, let's see, it's, and let me back up. This is to introduce also the exhibits that he did get, the records we just looked at, and the non-receipt, the fact that he wrote to the hospital but didn't get anything. Those were attachments to this. Okay, so on page three of this, remarks. A vocational expert will testify. So he had concerns that perhaps VE testimony would be necessary and at least called that expert. In the long run, no VE testimony was taken either because really the situation hadn't changed from hearing one. If anything, the records that were added, which included a report from a Dr. Nelson, showed that the appellant's situation had improved. Her global assessment of functioning on his examination had gone into the mild range, whereas previously all the assessments of functioning had been much lower than that. There was some testimony taken by the VE. Is that in the first hearing? That was the first hearing, yes. It was. And it was actually a different VE that came to the second hearing, a Mr. Clark, I think was his name, but he was never called. He was there, but Judge Adams did not ask him any questions. What was the hypothetical pose to the VE at the first hearing? Let's see if we can look at the transcript. I believe it mirrored the RFC assessment. I'm sorry, if you'll just give me a moment, I'll try to find it. 168, thank you. My esteemed opponent appoints us to excerpt of Record 168. In the lower right box, question. Hypothetical, we're setting out the age, education, work experience. She has this, that, and the other. She has a mood disorder, maybe some kind of personality disorder, maybe attention deficit hyperactivity disorder, maybe some other things. And then says, so let's say that she would be limited to a fairly simple kind of work, let's say not to involve more than three steps, and exertionally light work without postural. Is that something you can work with? Next page, yes. And so then we go on with the VE testimony. So the mental health records that we had really did not show that that simple work needed to be adjusted. And I see I've got a stop sign. So I would entertain any questions. I don't know that there are any other questions. Thank you. Thank you very much. Do you have a minute for rebuttal? Okay, thank you. The matter is submitted.
judges: Wallace, Noonan, Paez